This document was signed electronically on October 16, 2024, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated:  October 16, 2024



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) Case No. 21-50498 (Jointly Administered) |
| GENEVA VILLAGE RETIREMENT | ) |
| COMMUNITY, LTD., *et al.*, | ) Chapter 7 |
| | ) |
| Debtors. | ) Adversary Proceeding No. 21-05016 |
| | ) |
| | ) |
| | ) Judge Alan M. Koschik |
| GENEVA LIFE CARE CENTER, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GENEVA VILLAGE RETIREMENT | ) |
| COMMUNITY, LTD., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND PRELIMINARY REPORT AND
## <u>RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

This action was commenced in the Summit County, Ohio Court of Common Pleas (the "State Court") on June 9, 2020, as *Geneva Life Care Center, LLC v. Geneva Village Retirement Community, Ltd., et al.,* Case No. CV-2020-06-1681 (the "State Court Case"). On April 5, 2021, the Defendants removed the State Court Case to this Court.

Currently before the Court are cross-motions for summary judgment filed by plaintiff Geneva Life Care Center, LLC (the "Plaintiff") and jointly-represented defendants VRC, Inc. dba VRC Management, Inc. ("VRC") and Michael J. Francus ("Francus," and with VRC, the "Defendants"). For the reasons set forth herein, the Plaintiff's motion will be denied, and the Defendants' motion will be granted, in part, and denied, in part. To the extent the Court's decision to grant portions of the Defendants' motion relates to noncore claims, the ruling will constitute proposed findings of fact and conclusions of law reported and recommended to the United States District Court for the Northern District of Ohio for that court's consideration and entry of final judgment. 28 U.S.C. § 157(c).

## JURISDICTION AND VENUE

The Court has jurisdiction over this removed adversary proceeding pursuant to 28 U.S.C. § 1334(b), which grants the district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." This Court exercises that jurisdiction pursuant to General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012.

Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## DETERMINATION OF CORE AND NONCORE PROCEEDINGS

Pursuant to 28 U.S.C. § 157(b)(3), the Court must consider independently whether this adversary proceeding is a core proceeding. It is possible for an action to 'encompass both core and non-core issues.'" *In re McKenzie*, 471 B.R. 884, 898-99 (Bankr. E.D. Tenn. 2012) (quoting

*Beneficial National Bank USA v. Best Reception Systems, Inc. (In re Best Reception Systems, Inc.)*, 220 B.R. 932, 945 (Bankr E.D. Tenn. 1998)).  Each claim must, on its own, satisfy the requirements of 28 U.S.C. § 157(b) (establishing a nonexclusive list of core proceedings), and a court must examine each cause of action separately to determine if it is core or noncore. *Id.* (quotation omitted). When multiple causes of action are raised in the various pleadings in a given proceeding, the core/noncore analysis proceeds on a claim by claim basis.  *See Halper v. Halper*, 164 F.3d 830, 839 (3d Cir. 1999) (citing *Northern Pipeline Constr. Co. v. Marathon Pipe Line. Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)).

The Sixth Circuit has held that:

> "if the proceeding does not invoke a substantive right created by federal
> bankruptcy law and is one that could exist outside of the bankruptcy, then it is not
> a core proceeding. *In re Wood*, 825 F.2d at 97. Such a proceeding may be related
> to the bankruptcy pursuant to sections 1334(b) and 157(c), but it would not be a
> core proceeding within the meaning of section 157(b)."

*In re Wolverine Radio Co.*, 930 F.2d 1132, 1144 (6th Cir. 1991); *see also Giese v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 761 Fed. Appx. 553, 561 (6th Cir. 2019) (citing *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 34-36, 134 S. Ct. 2165, 189 L.Ed.2d 83 (2014)). Therefore, proceedings that are subject to bankruptcy jurisdiction solely because they are "related to [a bankruptcy] case[] under title 11" are noncore proceedings.  28 U.S.C. § 1334(b); *Wolverine Radio*, 930 F.2d at 1144.  "'[R]elated' proceedings are those that were owned by the debtor at the time the bankruptcy case was filed and became part of the estate pursuant to section 541(a), and those civil proceedings that take place between third parties, such as a suit between a creditor and a guarantor of a debtor's obligation."  1 COLLIER on BANKRUPTCY ¶ 3.05[2] at 3-82 (Richard Levin and Henry J. Sommer, Eds., 16th ed, June 2024).  The bulk of the claims remaining in this adversary proceeding not only *can* exist outside of bankruptcy, they *have* so existed, having been

originally filed in the State Court Case and removed to this Court pursuant to 28 U.S.C. § 1441. They are, therefore, noncore proceedings.

This Court already reached this conclusion earlier in this adversary proceeding in its oral ruling denying Plaintiff's Motion to Abstain or Remand (Docket No. 33) (the "First Remand Motion"). The Court's oral ruling was delivered on the record on August 27, 2021, and resulted in an Order Denying Plaintiff's Motion to Abstain or Remand entered on the same date. (Docket No. 48.) The oral ruling appears in a formal transcript prepared by the court reporter (the "Transcript") and filed on the docket two years later in connection with the Plaintiff's second remand motion (Docket No. 175) (the "Oral Ruling Denying Abstention and Remand" or "Oral Ruling").

At the time of the Oral Ruling, this adversary proceeding comprised a mixed bag of core and noncore claims. The Court concluded "that a substantial portion of the plaintiff's claims in [its] complaint … constitute [core] proceedings … and are not merely related to the [Debtors'] bankruptcy case." Transcript of Oral Ruling at 10:1-11.[1] These causes of action are core proceedings pursuant to, *inter alia*, 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (H), (K), and (O). Transcript of Oral Ruling at 10:20 to 11:1-2; 12:2 to 15:11.

However, with one limited exception, all of the core claims have been settled[2] and the remaining claims and causes of action arise under nonbankruptcy law and lie between

---

[1] The Court observes that the Transcript of the Oral Ruling Denying Abstention and Remand suffers from several material typographical errors perhaps resulting from the fact that the court reporter prepared the Transcript from an audio recording two years after the Oral Ruling was given. These errors may obscure aspects of the Oral Ruling. As a result, notwithstanding the passage of time, the Court has, contemporaneously with this Memorandum Opinion, filed on the docket its own informal transcript of the Oral Ruling as read into the record in the hopes of clarifying details of that ruling that might be difficult to discern in the official Transcript. *See* Informal Transcript of the Court's Oral Ruling Denying Abstention and Remand (Docket No. 199) (the "Informal Transcript").

[2] The defendants to this action originally included Geneva Village Retirement Community, Ltd. (defined herein as "Geneva Operator") and Geneva Village Retirement Community, LLC (defined herein as "Geneva Tenant"). Geneva Operator and Geneva Tenant (collective, the "Debtors") each filed chapter 11 bankruptcy petitions on

4

nondebtors. As the Court held in its Oral Ruling Denying Abstention and Remand, claims between nondebtor parties are noncore matters subject to the Court's "related to" bankruptcy jurisdiction only. Transcript of Oral Ruling at 11:3-11; 15:12 to 16:24. Therefore, the Court exercises jurisdiction over these remaining noncore causes of action in this adversary proceeding only because, in the language of section 1334, they are "related to" the estates of the debtors in the underlying case under title 11 in which this adversary proceeding arises.

Because the parties have not unanimously consented to the Bankruptcy Court entering final judgment in this action,[3] this Court is limited to making a report and recommendation regarding its proposed findings of fact and conclusions of law to the U.S. District Court with respect to the remaining noncore claims in this adversary proceeding. These claims include the Plaintiff's claims for causes of action for breach of contract, promissory estoppel, unjust enrichment, fraudulent inducement, and tortious interference. 28 U.S.C. § 157(c). Any final

---

March 30, 2021. Shortly thereafter, on July 2, 2021, the Debtors converted their cases to chapter 7 and Julie K. Zurn was appointed as the chapter 7 trustee (the "Trustee") of the Debtors' two estates. Zurn thereafter participated in this adversary proceeding as a defendant and counterclaim and crossclaim plaintiff. Zurn settled her counterclaims and crossclaims, as well the Plaintiff's claims in Counts II, III, IV, VIII, and IX of the Plaintiff's Complaint that had lain against the Debtors and their bankruptcy estates. These settlements resolved Count IV and, as discussed *infra*, Count IX completely and left only claims between the Plaintiff and one or both of the nondebtor Defendants on the other counts.

[3] In their Answer, the Defendants consented to the entry of final judgment. (Docket No. 73 ¶ 11.) However, even after amendment, the Complaint does not include the required statement regarding whether "the pleader does or does not consent to entry of final orders or judgment by the bankruptcy court." Fed. R. Bankr. P. 7008(a). The Plaintiff's silence in its pleading leaves open the possibility of concluding that the Plaintiff consented by implication. "Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683, 135 S.Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) (regarding so-called *Stern* claims, which are statutorily core but nonetheless require an Article III court to resolve for constitutional reasons absent consent of the litigants). However, reading the Plaintiff's consent into its mere silence in the pleadings would be an inappropriate application of the *Wellness International* standard. "It bears emphasizing … that a litigant's consent—whether express or implied—must still be knowing and voluntary. … [T]he key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Id.* at 685 (quotation omitted). Based on the procedural history of this removed action, which includes two motions filed by the Plaintiff seeking the bankruptcy court to abstain and/or remand this action to state court, the Court cannot make such a finding. Therefore, the Court concludes that the Plaintiff does not consent to the entry of final orders on noncore claims by the bankruptcy court.

order on those claims must be entered by the District Court.  *Id.*  However, this Court's report and recommendation shall remain preliminary and not be submitted to the District Court until this Court enters a final ruling in this adversary proceeding on all pending counts, whether a judgment on core claims or proposed findings and conclusions on noncore claims.  Fed. R. Civ. P. 54(b); Fed. R. Bankr. P. 7054(a).

Notwithstanding the predominance of noncore claims remaining in this adversary proceeding at present, this Court does have jurisdiction to enter a final judgment on one of the remaining claims.  Count IX of the Complaint, which on its face purports to seek a judgment piercing the corporate veil in favor of the Plaintiff so as to obtain a judgment against the (nondebtor) Defendants for the Debtors' liability to the Plaintiff, and which was couched in language that might limit it to a noncore claim, is in fact a core avoidance claim against the Defendants now held by the Trustee.  This is made clear in the Plaintiff's Motion, which argues that Count IX seeks avoidance and recovery of alleged fraudulent transfers pursuant to Ohio Revised Code ("O.R.C.") § 1336.01 *et seq*.  For reasons explained herein, these claims became property of the Debtors' bankruptcy estate upon the Debtors' bankruptcy filings.  Therefore, these claims constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(H) on which the Court can and will enter a final judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties filed stipulations of fact and stipulated exhibits on March 31, 2023 (Docket No. 180) (the "Stipulations").  The facts relied upon in this decision are those (i) stipulated by the parties, (ii) admitted in the Defendants' answer, (iii) apparent from the Court's docket, and/or (iv) established without material dispute by evidence introduced pursuant to Rule 56 of the

Federal Rules of Civil Procedure, which is incorporated into bankruptcy practice pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

On March 11, 2004, the Plaintiff entered into a Lease Agreement, a copy of which is attached to the Stipulations as Exhibit A (the "Lease Agreement"). The counterparty was listed in the opening paragraph as "Geneva Village DE, LTD., a Delaware limited liability company, as Mastertenant ("Tenant")." At the end of the 25-page document, on the signature page, Francus signed as "Managing Member" of "Geneva Village DE, LTD," in the Tenant's signature block. However, neither on March 11, 2004, nor at any time thereafter, did a Delaware corporate entity named Geneva Village DE, LTD exist. Pursuant to the Lease Agreement, "Tenant hereby leases from Landlord, the to-be-constructed long-term nursing facility … to be located at PPN 20-032-00-017-00, in Geneva, Ohio." The initial term of the Lease was for ten years beginning on the date the to-be-constructed building received its certificate of occupancy (the "Initial Term"), renewable at the tenant's option for up to two five-year increments thereafter.

Also on March 11, 2004, the Plaintiff and Geneva Village Retirement Community, Ltd. ("Geneva Operator") entered into a Lease Guaranty, stipulated as Exhibit B (the "Lease Guaranty"), "in consideration of the making of the Lease Agreement by and between Geneva Life Care Center, LLC (the "Lessor") and Geneva Village DE, LLC, (the "Lessee")." The name of the putative master tenant appears slightly differently on the Lease Agreement (as an "LTD") than it does in the Lease Guaranty (as an "LLC"). As with Geneva Village DE, LTD, neither on March 11, 2004, nor at any time thereafter, did an organized Delaware limited liability company named Geneva Village DE, LLC exist. Francus signed the Lease Guaranty in his capacity as managing member of Geneva Operator. Geneva Operator was organized and registered with the Ohio Secretary of State on March 10, 2004, the day before entering into the Lease Guaranty.

On November 8, 2005, Francus caused to be incorporated Geneva Village Retirement Community, LLC, a Delaware limited liability company ("Geneva Tenant"). (Francus Aff. ¶ 11, Docket No. 182-2.)

The Initial Term commenced May 1, 2006.

On May 14, 2006, the Plaintiff and Geneva Tenant entered into a First Amendment to the Lease Agreement (the "Lease Amendment," and together with the Lease Agreement, the "Lease"). (Stipulations at Exhibit C.) Plaintiff is defined as the "Lessor" and Geneva Tenant is defined as the "Lessee" in the Lease Amendment. The recitals in the Lease Amendment include, *inter alia,* "Whereas, on March 11, 2004, Lessor and Lessee entered into a Lease Agreement for the lease of the new nursing facility known as Geneva Village Retirement Community, and located at 1140 South Broadway, Geneva, Ohio." This is the same premises identified by parcel number in the Lease Agreement. (Francus Aff. ¶ 7, Docket No. 182-2.) The Lease Amendment does not mention either of the fictitious entities mentioned in the Lease Agreement (Geneva Village DE, LTD) or the Lease Guaranty (Geneva Village DE, LLC). The only other prior document it references is a "Certificate of Need ODH 8924-01-05," a document from the Ohio Department of Health increasing the allowed capacity of the nursing home from 77 to 80 beds. The record does not explain to which entity or person the Department of Health granted that Certificate of Need.

The terms of the Lease Amendment are comparatively mundane; they include an increase in the rent owed based on the increased capacity, as well as Geneva Tenant's agreement to reimburse the Plaintiff for certain additional construction costs. The Lease Amendment is signed by Francus in his capacity as managing member of Geneva Tenant. Steven Krutowsky, the same

8

member who signed the Lease Agreement on behalf of Plaintiff in 2004, also signed the Lease Amendment on behalf of Plaintiff in 2006.

On September 2, 2015, Francus, as managing member of Geneva Tenant, executed a notice of renewal of the lease (the "Notice of Renewal"), exercising an option contained therein to extend the term of the Lease by a further five years, beginning May 1, 2016. (Stipulations at Exhibit D). The Notice of Renewal was delivered contemporaneously to Plaintiff.

Geneva Tenant stopped paying monthly rent to Plaintiff beginning with the $53,007.50 installment due on March 20, 2020.

On June 9, 2020, Plaintiff filed the State Court Case against Geneva Tenant, Geneva Operator, and the Defendants in the State Court commencing State Court Case.

On December 1, 2020, Francus, as managing member of Geneva Tenant, executed a notice of non-renewal (the "Notice of Non-Renewal"), giving notice to Plaintiff that Geneva Tenant would not exercise its option to renew the Lease for an additional five years, so the lease would terminate effective May 1, 2021. (Stipulations at Exhibit E).

On March 30, 2021, Geneva Operator and Geneva Tenant (each a "Debtor," and collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The cases are being jointly administered under Case No. 21-50498 (the "Main Case").

On March 31, 2021, Geneva Operator delivered to each resident of the nursing home a notice that it proposed to transfer the resident to a specific other facility on or before April 30, 2021, and that Geneva Operator would be unable to operate its current facility after that date. (Francus Aff. ¶ 56 and Ex. 2 thereto, Docket No. 182-2.)

Geneva Operator and its successor operator executed an operations transfer agreement (Stipulations Ex. F) (the "OTA") effective April 2, 2021, subject at that time to the approval of this Court in the Main Case.

On April 5, 2021, the Defendants removed the State Court Case to this Court, creating this adversary proceeding.

On April 29, 2021, this Court approved the OTA in an order entered at Docket No. 78 of the Debtors' Main Case and the transfer of the nursing home facility became effective either April 30 or May 1, 2021, immediately following the cessation of Geneva Operator's operation of the facility.

On July 2, 2021, the underlying bankruptcy cases of the Debtors were converted to cases under chapter 7 of the Bankruptcy Code. Shortly thereafter, Julie K. Zurn was appointed chapter 7 trustee (the "Trustee") in those cases.

On December 17, 2021, the Plaintiff filed a motion for leave to amend its complaint. (Docket No. 58.) The Court granted that motion on January 21, 2022. (Docket No. 63.) The Plaintiff filed its amended complaint (Docket No. 70) (the "Complaint") in this adversary proceeding on February 8, 2022. The Complaint alleged nine counts against various defendants, summarized as follows, paired with the defendants named therein:

|  |  |
|---|---|
| I. | Breach of Contract (Francus and Geneva Tenant) |
| II. | Promissory Estoppel (Francus and Debtors) |
| III. | Unjust Enrichment (Francus and Debtors) |
| IV. | Action on Guaranty (Geneva Operator) |
| V. | Breach of Contract/Bad Faith – Interference with New Tenant (Francus) |
| VI. | Fraud in the Inducement – Failure to Incorporate (Francus) |
| VII. | Tortious Interference with Lender (Francus and VRC) |
| VIII. | Tortious Interference with Contract (Debtors, Francus, and VRC) |
| IX. | Piercing the Corporate Veil (Debtors and VRC) |

On February 22, 2022, the Trustee filed an answer to the Complaint, as well as a counterclaim against the Plaintiff and crossclaim against VRC. (Docket No. 72.) The crossclaims against VRC included counts for avoidance of fraudulent transfers under the Bankruptcy Code pursuant to 11 U.S.C. § 548(a)(1)(B); avoidance of fraudulent transfers under Ohio's Uniform Fraudulent Transfers Act ("UFTA"), O.R.C. § 1336.01 *et seq.*, by way of the Trustee's strong-arm powers pursuant to 11 U.S.C. § 544(b); and avoidance of preferential transfers pursuant to 11 U.S.C. § 547. Related counts of the Trustee's crossclaims sought to recover the avoided transfers for the benefit of the estate and disallow VRC's claim(s) against the Debtors until VRC returned the amounts of any avoided transfers to the estate.

Also on February 22, 2022, the Defendants filed an answer to the Complaint. (Docket No. 73.)

On March 8, 2022, the Plaintiff filed an answer to the Trustee's counterclaim. (Docket No. 74.)

On March 9, 2022, VRC filed an answer to the Trustee's crossclaim. (Docket No. 75.)

On September 2, 2022, the Trustee filed her Motion for Entry of an Order Approving Compromise and Settlement with the Plaintiff (Main Case Docket No. 203) (the "Landlord Compromise Motion"), which included the Trustee's proposed settlement agreement with the Plaintiff (Main Case Docket No. 203 Ex. A) (the "Landlord Settlement Agreement"). VRC filed an objection on September 23, 2022. (Main Case Docket No. 205.) The Trustee filed a reply in support on September 29, 2022. (Main Case Docket No. 206.) On October 11, 2022, VRC filed a further brief in opposition, styled as a "trial brief" though no trial was contemplated or ultimately held on the Landlord Compromise Motion. The Court held a hearing on the Landlord Compromise Motion on October 12, 2022, and granted the motion, with some revisions to clarify

11

that it did not intend to separately adjudicate the Defendants' objection to the Plaintiff's proofs of claim against the Debtors. On October 21, 2022, the Court memorialized its decision in an order granting the Landlord Compromise Motion, and approving the Landlord Settlement Agreement (Main Case Docket No. 211) (the "Landlord Compromise Order").

Pursuant to the Landlord Settlement Agreement, on November 9, 2022, the Plaintiff and Trustee jointly filed a motion to dismiss all of their claims and counterclaims against each other in this adversary proceeding with prejudice (Docket No. 140) (the "Joint Motion to Dismiss Landlord-Debtor Claims"). On November 22, 2022, the Court entered an order granting the Joint Motion to Dismiss Landlord-Debtor Claims (Docket No. 144) (the "Landlord-Debtor Dismissal Order"). Among other things, because Count IV is asserted only against Geneva Operator, one of the Debtors, Count IV of the Complaint was dismissed with prejudice upon entry of the Landlord-Debtor Dismissal Order. Since all other counts of the Complaint are asserted against at least one of the Defendants, Count IV was the only count fully resolved and dismissed pursuant to the Landlord-Debtor Dismissal Order.

On March 31, 2023, the Plaintiff and Defendants jointly filed the Stipulations.

On April 28, 2023, the Defendants filed a motion for summary judgment on all counts of the Complaint (Docket No. 182) (the "Defendants' Motion"). On the same date, the Plaintiff filed a motion for partial summary judgment (Docket No. 183) (the "Plaintiff's Motion"), seeking summary judgment specifically on its breach-of-contract claim (Count I) against Francus and its request to pierce the corporate veils of the Debtors (Count IX) "to hold both Francus and Defendant VRC liable for fraudulent transfers that have particularly harmed Plaintiff and that Plaintiff has particular standing to pursue under Ohio law." (Plaintiff's Motion at ii, Docket No. 183.)

On May 19, 2023, the Trustee filed her Motion for Entry of an Order Approving Compromise and Settlement (Main Case Docket No. 250) (the "Related Party Compromise Motion"), seeking approval of a settlement agreement attached thereto (Main Case Docket No. 250 Ex. B) (the "Related Party Settlement Agreement") between each of the Defendants, the Trustee, and certain other nondebtor parties related to the Defendants.

On June 2, 2023, the Defendants filed a response to the Plaintiff's Motion (Docket No. 190) (the "Defendants' Response") and the Plaintiff filed a response to the Defendants' Motion (Docket No. 191) (the "Plaintiff's Response").

On June 9, 2023, in the Main Case, the Plaintiff filed an objection to the Related Party Compromise Motion. (Main Case Docket No. 252.) On June 14, 2023, VRC filed a responsive brief in support of the Related Party Compromise Motion. (Main Case Docket No. 254.) On June 19, 2023, the Trustee filed a declaration in support of the Related Party Compromise Motion. (Main Case Docket No. 255.)

On June 21, 2023, the Plaintiff filed a reply in support of the Plaintiff's Motion (Docket No. 193) (the "Plaintiff's Reply"), and the Defendants filed a reply in support of the Defendants' Motion (Docket No. 194) (the "Defendants' Reply"). On the same date, in the Main Case, the Plaintiff withdrew its objection to the Related Party Compromise Motion. (Main Case Docket No. 256.)

On June 26, 2023, the Court entered an order granting the Related Party Compromise Motion, approving the Related Party Settlement Agreement. (Main Case Docket No. 257.) With this settlement in place, the Trustee dropped out of this adversary proceeding, having settled all claims concerning her and the Debtors' bankruptcy estates. The surviving claims lie between and among the Plaintiff and the Defendants only.

The Court held oral argument on the Plaintiff's Motion and the Defendants' Motion on July 17, 2023.

## SUMMARY JUDGMENT STANDARD

In bankruptcy cases, including adversary proceedings, a party may move for summary judgment at any time before 30 days before the initial date set for an evidentiary hearing on any issue for which summary judgment is sought, unless a different time is set by local rule or the court orders otherwise. Fed. R. Bankr. P. 7056 (otherwise incorporating Fed. R. Civ. P. 56); *see also* Fed. R. Bankr. P. 9014(c). When a party so moves, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). A Plaintiff moving for summary judgment must establish all essential elements supporting its claim in this fashion; a defendant must establish that any one (or more) essential elements of Plaintiff's claim fails, or establish all elements of one or more of defendant's affirmative defenses, in order to obtain a defense judgment by summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Evidence presented in support of summary judgment is viewed in the light most favorable to the non-moving party, "drawing all reasonable inferences in its favor." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986). However, if a moving party meets its burden to establish a lack of genuine dispute as to a material fact, the burden then shifts to the non-moving party to "come forward with evidence which would support a judgment in its favor." *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e). Once the movant succeeds in shifting the burden to come forward, the non-moving party may not rely on a "mere scintilla of evidence" in support of its opposition to the motion. There must be enough evidence

presented in which a fact-finder could reasonably find for the non-moving party. *Zenith*, 475 U.S. at 586.

The trial court has no duty to search the entire record to establish that it is bereft of a genuine issue of material fact before granting a motion for summary judgment.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

## LEGAL ANALYSIS

The Court concludes that the Lease was, from 2004 to 2021, a valid and enforceable contract governing the subject matter of this litigation, but that the unexplained change in party identification between the Lease Agreement and Lease Amendment creates ambiguity that must be resolved by parol evidence, and that insufficient parol evidence admissible under the relevant standard for considering evidence on summary judgment is available to grant summary judgment for either the Plaintiff or the Defendants on Count I of the Complaint.

However, because it is clear that the Lease, as a whole, formed a valid and enforceable contract controlling the subject matter of the litigation, even if its terms and parties bound may remain in dispute, promissory estoppel and unjust enrichment are not available as theories of recovery, and any liability of the Defendants to the Plaintiff must be based on the contractual terms of the Lease as applied by Ohio contract law, not under quasi-contractual theories of recovery.  Therefore, summary judgment for the Defendants is appropriate on Counts II (promissory estoppel) and III (unjust enrichment) of the Complaint.

Summary judgment in Francus' favor is appropriate on the Plaintiff's fraudulent inducement claim in Count VI, both because the claim has been brought outside the statute of limitations and because no reasonable factfinder could conclude that a misrepresentation about

15

the incorporated status of the tenant corporation by Francus in 2004 was the proximate cause of the harm to the Plaintiff caused by the Debtors ceasing to pay rent in 2020.

Counts V, VII, and VIII of the Complaint involve actions allegedly taken by Francus (Count V) or both Defendants (Counts VII and VIII) during the waning months of the Lease and of Geneva Operator's operation of the facility. Counts V and VIII, the former superficially for breach of contract and the latter for tortious interference with contract, are based on similar allegations that Defendants interfered with the Plaintiff's efforts to find a new tenant and operator for the facility after it became clear that the Lease would not be renewed and that Geneva Operator's continued operation of the facility was going to end. Count VII is a separate count for tortious interference with the Plaintiff's agreements with its principal lender, Fifth Third Bank ("Fifth Third").

The Court concludes that the Plaintiff has not shown a triable issue of material fact on Count VII, and that no reasonable trier of fact could find that the Defendants interfered with the Plaintiff's contractual relations with Fifth Third. Therefore, the Court will grant summary judgment in favor of the Defendants on this count.

With respect to Count V, Francus, the only Defendant against whom Count V was brought, did not move for summary judgment, or at least did not develop an argument for summary judgment in the Defendants' Motion. Furthermore, the Court concludes that the Plaintiff has shown a triable issue of fact with respect to whether certain of the Defendants' actions might have had the effect of sharply reducing the number of residents in the building at the time that the operations transferred, and that the Plaintiff may be able to show harm from those actions based on concessions it was forced to make to the new operator. Therefore, the Court will deny summary judgment for the Defendants on Counts V and VIII.

16

Count IX of the Complaint was not, on its face, specific regarding the alleged fraudulent, illegal, or otherwise inequitable acts that would justify piercing the Debtors' corporate veils. However, as developed in the Plaintiff's Motion and summary judgment briefing, the only such acts alleged are fraudulent transfers pursuant to Ohio's UFTA, O.R.C. § 1336.01 *et seq*. These avoidance actions became property of the estate and passed to the control of the Trustee, who has settled them with the approval of this Court. Therefore, summary judgment for the Defendants is appropriate on this claim as well.

I.   **Both Plaintiff's and Defendants' Motions for Summary Judgment Will Be Denied on Count I of the Complaint Because the Evidence Presented Is Insufficient To Prove Either an Assignment or Novation of the Lease with Undisputed Facts, and the Court Is Unpersuaded That Those Two Legal Conclusions Represent the Only Possible Ones That Could Result from the Change in Party Identification That Occurred Between the Lease Agreement and Lease Amendment.**

Section 20.03 of the Lease Agreement provides that it "will be construed under and in accordance with the laws of the State of Ohio." Ohio follows the Restatement (Second) of Conflict of Laws § 187, "which instructs courts to generally respect choice-of-law provisions," with two exceptions not applicable here. *See Wise v. Zwicker & Associates, PC*, 780 F.3d 710, 715 (6th Cir. 2015). Ohio contract law thus controls this Court's analysis of the Lease, including whether the change in party identification between the Lease Agreement and the Lease Amendment establishes a novation, assignment, or neither.

The construction of written contracts is a matter of law. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. "The purpose of contract construction is to discover and effectuate the intent of the parties," and "[t]he intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313, 1996-Ohio-393, 667 N.E.2d 949, 952 (1996) (citations omitted). "Furthermore, where the terms in an existing contract are clear and

17

unambiguous, [the] court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander*, 53 Ohio St. 2d at 246.

However, "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 76 Ohio St. 3d at 313-14; *accord Illinois Controls, Inc. v Langham*, 70 Ohio St. 3d 512, 521, 1994-Ohio-99, 639 N.E.2d 771, 779 (1994) ("It is axiomatic that, where a contract is ambiguous, parol evidence may be employed to resolve the ambiguity and ascertain the intention of the parties.")

In this case, extrinsic evidence will be necessary to ascertain the intent of the parties, because neither the Lease Amendment nor any other stipulated or uncontested document offer a clear, undisputable explanation of how the named tenant on the Lease ceased to be the never-existent Geneva Village DE, LTD and became Geneva Tenant. The Defendants argue that the Lease created by the Lease Agreement was novated by the Lease Amendment. The Plaintiff disagrees, arguing that the change in the party name on the contract documents and in the parties' course of dealing did not effect a novation. Secondarily, the Plaintiff offers a counter-explanation to the Defendants' novation theory: that Francus, in his individual capacity, was the original legal tenant who merely assigned his rights under the Lease to Geneva Tenant. The Plaintiffs contend that an assignment of the Lease would not, as a matter of law, release the original tenant without the consent of the Landlord. The Court finds that neither of these conclusions can be reached on summary judgment because the Court's decision will turn on its finding regarding the intent of the parties, a factual inquiry that is subject to a genuine dispute. The Court must construe the facts in the light most favorable to the nonmoving party and the Court may not resolve genuine disputes of material fact without a trial.

18

Moreover, the evidence presented on summary judgment suggests a possible outcome in which neither a novation nor an assignment occurred. Rather, the intent of all parties and their principals might have been that the contracting parties never changed, even though the precise name of the tenant changed in the documents between 2004 and 2006. The original tenant name may have been a mere placeholder used in anticipation of the formal incorporation of Geneva Tenant.

Both the assignment theory and the novation theory strike this Court as possible *post hoc* reinterpretations—or rationalizations—of what happened between 2004 and 2006. Neither the Plaintiff nor the Defendant appear to argue in their respective briefing that assignment and novation complete the universe of possible legal conclusions resulting from the as-of-yet unexplained change in party identification between 2004 and 2006. In fact, some of the legal opinions cited by the parties discuss other theories that were not advanced here, *e.g.*, that Francus might have been a "promoter" of Geneva Tenant prior to its incorporation. The Court makes no legal conclusions regarding theories that were not advanced on summary judgment, but includes this discussion to illustrate that other possibilities may exist.

**A.     Plaintiff's Argument That This Is a Simple Case of Liability of an Individual Signing on Behalf of a Fictitious Legal Entity Ignores Fifteen Years of Course-of-Dealing That Suggests a Different Intended Outcome and Creates a Genuine Issue of Material Fact.**

In its primary argument, the Plaintiff asks this Court to find that this is case is no more complex when Geneva Tenant stopped paying rent in 2020 than it would have been if a breach of the Lease had happened between 2004 and 2006. The Plaintiff contends that Francus signed on behalf of Geneva Village DE, Ltd., that that entity was never legally organized, and that, therefore, Francus is personally liable regardless of any events that happened after 2004 because he never obtained an express release from the Plaintiff.

19

None of the judicial opinions cited by the Plaintiff in support of its Motion considered evidence of subsequent course-of-dealing comparable to the facts in this case that a plaintiff asked a court to dismiss as irrelevant. The principal cases the Plaintiff cites to support its argument that Francus remains personally liable on the Lease are *Patterson v. V & M Auto Body*, 63 Ohio St. 3d 573, 589 N.E.2d 1306 (1992), *Stanwade Metal Products v. Heintzelman*, 158 Ohio App. 3d 228, 814 N.E.2d 572 (11th Dist. 2004), and *Ikerd Scuba Enterprise, LLC v. Lakes*, 2014 WL 586241, 2014-Ohio-533 (Ohio Ct. App. Feb. 14, 2014).

*Patterson* is a short and simple case primarily about the capacity to sue and be sued, and holds that an action cannot be validly commenced against the fictitious name of a sole proprietorship. Instead, it must be commenced against the individual doing business as a sole proprietor, regardless of whether that sole proprietor does business under a fictitious or trade name and regardless of whether the sole proprietor properly receives notice of the action and defends it. *Patterson*, 63 Ohio St. 3d at 577. "If a defendant in a lawsuit is not an actual or legal entity, then any judgment rendered against that entity is void." *Id.* at 576. This case would be most directly relevant to defend against a hypothetical action against either "Geneva Village DE, Ltd." or "Geneva Village DE, LLC," the two fictitiously named, never organized entities referenced in the 2004 Lease Agreement and Guaranty. This case might also be applicable if this suit were brought against Francus prior to November 8, 2005, the date on which Geneva Tenant was incorporated, or perhaps as late as the earlier of the May 14, 2006 execution of the Lease Amendment or whatever point in time between November 8, 2005, and May 14, 2006, all parties agreed that Geneva Tenant was the sole tenant on the Lease. It is less clearly applicable now, when the named tenant on the Lease has been, since no later than May 14, 2006, an incorporated entity with full capacity to sue and be sued.

*Stanwade,* to the extent relevant, cites *Patterson* for the same proposition of law: "Although a party may do business under a trade name or fictitious name if it chooses, '[d]oing business under another name does not create an entity distinct from the person operating the business. The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations.'" *Stanwade*, 158 Ohio App. 3d at 236 (quoting *Patterson*, 63 Ohio St. 3d at 575). There were further complications in *Stanwade* not relevant here but that were central to that case, *i.e.*, the individual defendant also "failed to disclose to [the plaintiff] that he was simultaneously and interchangeably acting as agent" for four different entities (including both formally incorporated and fictitious ones), *id.* at 236, and so was exposed to personal liability because of his failure to clearly identify the capacity in which he was dealing with respect to the later-disputed transaction. *Id.*

Finally, in *Ikerd Scuba Enterprises*, three individuals signed a commercial lease with "no indication by any of the signing parties that they were signing on behalf of a corporation or any other business entity." *Ikerd Scuba*, 2014 WL 586241, at *1. "It is undisputed that [the fictitious entity] Advanced Spas & Pools is identified as the tenant in the lease. However, defendants all signed the lease without stating that they were signing in their official capacities on behalf of Advanced Spas & Pools. Previous decisions have found individual liability when a party signs a contract without stating that the party is signing in his corporate capacity for a corporation." *Id.* at *3.

In this case, the Lease Agreement expressly provides that Francus is signing as a managing member, not individually. This alone would not be sufficient to defend him from personal liability if there were a breach of the Lease prior to the incorporation of Geneva Tenant and the execution of the Lease Amendment, but none of the decisions cited by Plaintiff offer

21

meaningful analogues to those later developments in this case. The cases cited by Plaintiff would be better precedent if the Lease Amendment had never been executed, and there were not fifteen further years of history in which Plaintiff, the Debtors, and the Defendants all referred to Geneva Tenant as the tenant on the Lease in their formal documents and correspondence, including to third parties such as regulators and lenders. If the four corners of the Lease, as amended, *still* referred to the fictitious Geneva Village DE, Ltd. as the tenant, and the parol evidence confirmed that there were frequent references to that fictitious entity after 2006, whether in communications between the parties or to third parties, these authorities might be more directly applicable to this case. However, the subsequent history spanning nearly a decade and a half present in this case makes the Plaintiff's argument appear to be a *post hoc* reinterpretation or rationalization of long-ago events.

**B.      Summary Judgment in Favor of Francus Is Inappropriate on Count I, Because His Novation Theory Requires a Showing of Clear and Definite Intent and That Intent Remains a Genuine Issue of Material Fact.**

Francus argues that "[i]f 'Geneva Village DE, Ltd. were an original party to the Lease Agreement, the language of the First Amendment to Lease is a legal novation of the Lease Agreement." (Defendants' Motion at 22, Docket No. 182; *accord* Defendants' Response at 14, Docket No. 190.) The Court remains open to the possibility that the Lease Amendment is evidence that a novation happened at some point *between* 2004 and 2006, which could be further reinforced by parol evidence—the conduct of the parties both between 2004 and 2006 and by later conduct consistent with this interpretation. However, the Lease Amendment itself evidences no clear and definite intent to release, substitute, or otherwise modify any party to the Lease. Its direct subject matter is much more mundane and does not expressly address why the

22

Tenant is identified with a new legal name. Moreover, a showing of clear and definite intent is a required element of establishing that a novation occurred:

> A novation occurs "where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *McGlothin v. Huffman* (1994), 94 Ohio App.3d 240, 244, 640 N.E.2d 598, 601. In order to effect a valid novation, **all parties to the original contract must clearly and definitely intend the second agreement to be a novation and intend to completely disregard the original contract obligation.** *Citizens State Bank v. Richart* (1984), 16 Ohio App.3d 445, 446, 16 OBR 516, 517–518, 476 N.E.2d 383, 385–386; *Sherwin–Williams Co. v. Glenn Paint & Wall Paper Co.* (App.1927), 6 Ohio Law Abs. 101 (novation is an agreement to release a previous debtor and look only to a subsequent debtor). In addition, to be enforceable a novation requires consideration. *Wilson v. Lynch & Lynch Co., L.P.A.* (1994), 99 Ohio App.3d 760, 651 N.E.2d 1328. A novation can never be presumed. *Citizens State Bank,* 16 Ohio App.3d at 446, 16 OBR at 517–518, 476 N.E.2d at 385–386.

*Moneywatch Cos. v. Wilbers*, 106 Ohio App. 3d 122, 125, 665 N.E.2d 689 (Ohio App. 1995) (emphasis added). "A party's knowledge of and consent to the terms of a novation need not be express, it may be implied from the circumstances or the parties' conduct." *Wenner v. Marsh USA, Inc.*, 2002 WL 826021, at *3, 2002-Ohio-2176 ¶14 (Ohio App. May 2, 2002). However, *Wenner* itself cautions against finding a non-express novation based on circumstances and conduct in this posture, on summary judgment, when the Court must draw all factual inferences in favor of the nonmoving party. The Ohio appellate court in *Wenner* reversed a trial court that had done precisely that. Immediately after noting the rule allowing consent to novation to be implied from circumstances or conduct, the appellate court cautioned that "a novation cannot be accomplished 'without negotiating a common understanding with the other party or parties to an arrangement.'" *Id.* (quoting *Livernois v. Warner-Lambert Co., Inc.*, 723 F.2d 1148, 1153 (4th Cir. 1983)). Based on this authority, *Wenner* held that the original obligor "failed to allege the necessary facts or present evidence sufficient to support to grant of summary judgment in its

favor," because there was "no evidence of a 'common understanding' between all the parties to the agreement that the [original obligor] would be relieved from liability." *Id.* at *3.

In this case, there is some evidence that the common understanding of the parties was that Geneva Tenant would be liable on the Lease and Francus and VRC would not: Francus never expressly signed the Lease Agreement personally nor did he guaranty the Lease Agreement as Geneva Operator did. However, that evidence is not so overwhelming that it can justify judgment in favor of the Defendants, especially after viewing it in the light most favorable to the Plaintiff. Genuine disputes of material fact remain.

In *Moneywatch*, the appellate court affirmed a trial court's determination that no novation occurred that would release the appellant from personal liability on a commercial lease that he originally signed individually before the tenant name was changed to the corporation that he later formed.

However, there are many factual distinctions between *Moneywatch* and this case. *Moneywatch* was an appellate court decision considering an appeal from the findings and conclusions of the trial court following trial, not on summary judgment. The trial court was under no obligation to construe any facts in the light most favorable to opposing party, and the appellate court's review was "restricted to whether there [was] some evidence in the record to support the trial court's findings." *Moneywatch*, 106 Ohio App. 3d at 128.

In *Moneywatch*, the landlord's property manager was aware, at the time the lease was signed, that no tenant corporation had been formed and advised the individual who intended to form the corporation that he would need to remain personally liable on the lease even if the corporation were subsequently formed. In this case, the Plaintiff did not have the opportunity to warn Francus about his personal liability because it was apparently under the belief that the

24

tenant corporation had already been formed. In that context, if shown to be true, it is striking that the Plaintiff did not obtain a personal guaranty from Francus or a corporate guaranty from VRC. Instead, it sought, and obtained, a corporate guaranty from Geneva Operator only.

Relatedly, in *Moneywatch*, the original lease was signed by the individual as tenant, with a dba alias, so there was clear record evidence that the parties intended the individual to be bound. There is no such evidence here, and in fact the evidence available on summary judgment suggests that the intent of the parties was for a corporate tenant and corporate sublessee, as guarantor, to be liable on the Lease.

In addition, in *Moneywatch* there was an express substitution of parties. There was nothing analogous to the Lease Amendment here, in which both parties recite as a matter of course that Geneva Tenant entered into the Lease on March 11, 2004, and make no reference to any change in parties either before the May 14, 2006 date of the Lease Amendment or as part of the Lease Amendment.

In summary, in *Moneywatch* the evidence showed a clear intent to obligate an individual to pay the commercial rent in question and not to release that individual from the obligation when the later-formed corporation was added. The evidence available on summary judgment in this case does not obviously lead to that conclusion. Most important, however, is that unlike *Moneywatch*, this case has not yet been subjected to trial.

*Moneywatch* also analyzes an alternative argument, in which the individual contended that he was not personally liable on the commercial lease as a promoter of the later-formed corporation. "Corporate promoters are those who participate in bringing about the organization of an incorporated company, and in getting it in condition for transacting the business for which it is organized." *Id*. at 126 (quotation omitted). In their Answer (Docket No. 73), the Defendants

even reference the theory that Francus could be considered a promoter of Geneva Tenant (Docket No. 73 ¶ 19), but do not develop that in their briefing, so of course the Plaintiff does not respond to it, nor does the Plaintiff raise the theory separately in its own briefing. While there might be good reasons for ignoring this theory on summary judgment, the Court observes that the evidence presented on summary judgment *may* correspond more closely to this theory than to either the novation theory advanced by the Defendants or the assignment theory advanced by the Plaintiff. If nothing else, this discussion in *Moneywatch* reinforces the observation that the law does not necessarily require the Court to conclude either that the Lease Agreement was assigned or novated on the fact pattern of this case; that is a false binary, and there may be other possibilities.

C.    **The Plaintiff's Attempt to Refute Francus' Novation Theory by Arguing Instead That the New Party Identification Constituted an Assignment of Rights Under the Lease to Geneva Tenant Is Not Supported by Undisputed Evidence, Is Not Asserted In the Pleadings, and Is Not Argued Affirmatively in the Plaintiff's Motion.**

The Plaintiff argues that the new party identification in the Lease Amendment constitutes an assignment, not a novation, and therefore Francus remains liable on the Lease for having executed the Lease on behalf of a fictitious corporate entity.[4] The assignment theory advanced

---

[4] The Plaintiff invokes the rule that an assignment of rights under a lease does not release a lessee from its express obligations under the lease absent a showing of intent by the lessor to release the original lessee:

> Generally, an assignment divests the original lessee of his interest in the property, but not of his responsibilities under express covenants provided in the lease. *Rentz v. Bannister* (Oct. 11, 1995), 2nd Dist. No. 15041, citing *Sutliff v.. Atwood* (1864), 15 Ohio St. 186. Included in these express covenants is the covenant to pay rent throughout the full term of the lease. *Gholson v. Savin* (1941), 137 Ohio St. 551, 557, 31 N.E.2d 858; *Blosser v. Enderlin* (1925), 113 Ohio St. 121, 148 N.E. 393, paragraph three of the syllabus. Mere consent by the lessor to the assignment of the lease and receipt of rent from the assignee, without more, will not discharge the original lessee from his liability. *N.R.I. Co. v. N .R. Dayton Mall, Inc.* (Nov. 1, 1991), 2nd Dist. No. 12528, citing *City of National Bank and Trust Co. v. Swain* (1939), 29 Ohio Law Abs. 16, 25–26. See, also, *Bishop Kandel Realty v. Meadows* (Nov. 5, 1991), 3rd Dist. No. 5–91–9, and *Sutliff,* 15 Ohio St. 186 at paragraph three of the syllabus. "A lessor must agree, either expressly or by implication, to not hold the assignor liable upon an assignee's default." *N.R.I. Co., supra.*

26

by the Plaintiff does not appear in the Complaint or the Plaintiff's Motion. Instead, the Plaintiff clarifies in its Reply that this theory is raised on summary judgment only as a counterargument to the Defendants' novation theory. "Plaintiff is *not* seeking to hold Francus liable pursuant to any assignment, but rather as the principal tenant under the Lease." (Plaintiff's Reply at 4, Docket No. 193.) The Plaintiff argues that the recital in the Lease Amendment naming only Geneva Tenant as the lessee "is nothing more than either a recognition that [Geneva Tenant] was an assignee of the Lease or, at worst, an inaccurate statement by the parties, and it cannot turn an impossibility into a reality." (Plaintiff's Response at 12, Docket No. 191.)

However, that "inaccurate statement" appears to be consistent with both the intent and conduct of the parties for seventeen years, and particularly for the fifteen from the Lease Amendment to 2021. As a result, it would be difficult for the Court to determine on the limited record available on summary judgment whether the transition that occurred in this case constituted a novation, assignment, or something else. Too many unresolved factual questions remain, foreclosing summary judgment.

For example, "[a]n assignment of contract rights is, itself, a contract, and thus, in order to establish an assignment, the elements of a contract must be present," including mutual assent, consideration, and that the contract was definite as to its essential terms. *Mid American Construction, LLC v. University of Akron*, 2019 WL 4667581, at *15, 2019-Ohio-3863, ¶ 79 (Ohio Ct. App. Sept. 24, 2019) (citations omitted). To show an assignment, the Plaintiff would need to show that the elements of an independent contract of assignment existed between Francus and Geneva Tenant. No formal instrument of assignment appears in the record. Therefore, the Court would need to find a contract implied by conduct. However, the Plaintiff

---

*Manlaw Investment Co. v. Mariott Corp.*, 2003 WL 21040643, *2, 2003-Ohio-2347 (Ohio Ct. App. May 7, 2003).

makes no serious attempt to establish these elements with evidence of relevant conduct, and there is insufficient record evidence for the Court to make such findings. While Francus' argument that the Lease Amendment constitutes or evidences a novation of the Lease Agreement is not supported by sufficient evidence to grant summary judgment in his favor, there is at least some supporting evidence. There is no evidence supporting the assignment theory. Nowhere before 2021 is Geneva Tenant referred to as an assignee in either formal contract documents or in correspondence between the parties, nor is either Francus or the fictitious Geneva Village DE, Ltd. referred to as an assignor.

The Plaintiff essentially asks the Court to fill in the gaps in the evidentiary record with factual assumptions in its favor, and then conclude that an assignment *must* have happened based on the fact that Francus signed as managing member of an unincorporated entity, never obtained an express release from the Plaintiff of liability for doing so, and then all parties simply started treating Geneva Tenant as the tenant on the Lease on or before the date of the Lease Amendment. The Court would not even do this after trial, let alone on summary judgment when it must view the facts in the light most favorable to Francus on this issue.

The Court therefore concludes that summary judgment is not appropriate for either the Plaintiff or Francus on Count I of the Complaint.

II. **Summary Judgment for the Defendants Is Appropriate on Counts II (Promissory Estoppel) and III (Unjust Enrichment) Because Promissory Estoppel and Unjust Enrichment Are Inapplicable When an Express Contract Governs the Subject Matter of the Litigation, as Has Been Established Here with Undisputed Facts.**

"Absent bad faith or fraud, Ohio law makes quasi-contractual theories of recovery unavailable where, as here, the parties have a written agreement that covers the claims at issue." *RAM Construction Services of Cleveland, LLC v. Key Construction, Inc.*, 624 F.Supp. 3d 884, 896 (N.D. Ohio 2022). "Because unjust enrichment is a quasi-contractual remedy … a plaintiff

28

cannot recover for unjust enrichment when an express contract governs the subject matter of the litigation." *McCarthy v. Ameritech Publishing, Inc.*, 763 F.3d 469, 487 (6th Cir. 2014); *see also RAM Construction*, 624 F.Supp. 3d at 896-97 ("The doctrine of unjust enrichment … is inapplicable if an express agreement existed concerning the services for which compensation is sought." (internal quotation omitted)).

"An action for damages under promissory estoppel provides an adequate remedy for an unfulfilled or fraudulent promise.  The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice." *Olympic Holding Co., LLC v. ACE Ltd.*, 122 Ohio St. 3d 89, 97, 2009-Ohio-2057, ¶ 39, 909 N.E.2d 93, 101 (2009).  Because it can only apply when the requisites of contract are not met, "[l]ike unjust enrichment, promissory estoppel is not an available remedy where the legal relationship of the parties is governed by a valid and enforceable contract." *RAM Construction*, 624 F.Supp. 3d at 897 (quotation omitted).

The Lease Agreement, subject to its various amendments and extensions between 2006 and 2021, was a valid and enforceable contract and governed the subject matter of the transaction in dispute here.  As such, promissory estoppel and unjust enrichment are not available as theories of recovery to the Plaintiff.  The Plaintiff must prove that Francus was bound by the Lease to recover damages against Francus that flow from the breach of the Lease.  The Plaintiff cannot end-run the terms of the Lease by arguing that those same obligations are duplicated in quasi-contract if they were omitted from the controlling contract itself.

The Court therefore concludes that summary judgment should be entered in favor of the Defendants on Counts II and III of the Complaint, and its report and recommendation to the district court will so reflect.

### III. The Defendants' Motion for Summary Judgment on Count V of the Complaint Will Be Denied.

Count V of the Complaint is captioned "Breach of Contract/Bad Faith – Interference with New Tenant." (Complaint at 10, Docket No. 70.) It cites to section 11.04 of the Lease Agreement, alleging that pursuant to that section, "Francus is responsible for all lease costs, including rent, taxes, and maintenance due because Plaintiff cannot obtain a new tenant." (Complaint ¶ 84, Docket No. 70.) However, that section of the Lease Agreement does not impose any duties on the tenant or its affiliates with respect to securing a new tenant-operator upon termination of the Lease. That section allows the Plaintiff to take over the operation of the nursing home facility in the event of a termination of the Lease, without assuming any of the tenant's obligations or liabilities. Notwithstanding the "breach of contract" caption and the citation to section 11.04 of the Lease Agreement, the substance of the claim appears to sound in tort: The Plaintiff alleges that Francus knew that the Plaintiff was seeking a new tenant for the Property, and that Francus "made false statements, threats, and demands that have interfered with Plaintiff's ability to obtain a new tenant." (Complaint ¶ 81, Docket No. 70.)

Although the Defendants' Motion ostensibly seeks summary judgment on all counts of the Complaint (Defendants' Motion at 2, Docket No. 182), it does not directly or specifically address Count V. To the extent that Count V is a separate cause of action for breach of the Lease Agreement regarding Defendants' conduct in connection with signing a new tenant, summary judgment for the Defendants would be inappropriate on Count V. To the extent that Count V largely overlaps the substantive allegations in Count VIII, regarding the Defendants' alleged tortious interference with the Plaintiff's prospective contract with a new tenant, summary judgment on Count V would also be inappropriate for the same reasons that it finds summary judgment to be inappropriate on Count VIII, *infra*.

Therefore, the Court will deny the Defendants' Motion seeking summary judgment on Count V.

**IV.     On Count VI (Fraud in the Inducement), Summary Judgment in Favor of the Defendants Is Appropriate Both Because the Statute of Limitations Expired Four Years After the Plaintiff Knew or Should Have Known That Geneva Tenant Was Not Incorporated as of March 11, 2004, and Because the Plaintiff Cannot Prove That Its Damages in 2020 and Later Were Proximately Caused by a Misrepresentation in 2004.**

Count VI of the Complaint alleges that Francus "falsely warranted and represented that Geneva Village DE, LTD was incorporated and/or registered" (Complaint ¶ 88, Docket No. 70), and that because this was not true and the Plaintiff relied on it, "Plaintiff has been left with a non-performing tenant that is not licensed or certified to operate the Facility and has been damaged in the full amount owed for the remaining term of the Lease, in excess of $700,000." (Complaint ¶ 93, Docket No. 70.)

**A.     Statute of Limitations.**

The relevant statute of limitations Ohio Revised Code provides that, with the exception of identity fraud, causes of action for fraud must be brought within four years after the cause accrued.  O.R.C. § 2305.09(C).  This includes causes of action for fraudulent inducement.  *See State ex rel. Rogers v. Republic Environmental Systems, Inc.*, 2010 WL 4615835, at *3, 2010-Ohio-5523, ¶ 21 (Ohio App. Nov. 12, 2010).  The action must be initiated within four years after the misrepresentation should have been discovered.  *Snell v. Salem Ave. Associates*, 111 Ohio App. 3d 23, 42, 675 N.E.2d 555, 568 (1996).  "No more than a reasonable opportunity to discover the misrepresentation is required to start the period of limitations.  Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence."  *Id.* at 42 (*quoting Craggett v. Adell Ins. Agency*, 92 Ohio App. 3d 443, 454, 635 N.E.2d 1326, 1333 (1993)).

31

In response, the Plaintiff cites *C.E. Greathouse & Son, Inc. v. City of Middletown*, 1986 WL 7391 (Ohio Ct. App. June 30, 1986) (per curiam), and specifically that decision's discussion of the rule on delayed damages:

> However, wrongful conduct does not always immediately produce actual injury or damage, so another rule is necessary for these cases. The corollary rule developed for this situation holds that where the injury caused by wrongful conduct is not immediately apparent and does not immediately result in actual injury, a cause of action does not accrue until actual injury or damage occurs.

*Id.* at *4. Based on this, the Plaintiff argues that the "statute of limitations began to run when Plaintiff was injured—*i.e.*, when Francus et al. stopped paying rent—not when the fraudulent representations and warranties were originally made." (Plaintiff's Response at 22, Docket No. 191.)

This stretches the delayed-damages doctrine too far, however. The misrepresentation complained of in this case was not only known to the Plaintiff, *but was corrected*, no later than May 14, 2006, the date of the Lease Amendment, at which time the Plaintiff had suffered no damages and would not for fourteen more years. As with the breach of contract claim, the fraudulent-inducement claim could easily sit in a very different position if the Plaintiff suffered damage in 2005, and it was then discovered that Geneva Village DE, LTD did not legally exist.

*C.E. Greathouse* affirmed the trial court's dismissal of a retail merchant's complaint against the city of Middletown on statute of limitations grounds. The merchant alleged that it was induced to become a tenant at a new downtown enclosed shopping center and expend significant amounts of its own money on leasehold improvements, because representatives of the city claimed they already had an "abundance" of other tenants secured to ensure that the shopping center would be successful. The center opened in 1975 and was never as successful as either the city or the merchant hoped, and the merchant sued the city for, *inter alia*, fraudulent inducement in 1984. The trial court dismissed this action on statute of limitations grounds, and

32

the Twelfth District Court of Appeals affirmed, because "by 1975 appellant was or should reasonably have been aware that appellee's 'abundancy of tenants' statements were false and two major tenants had not been secured." *C.E. Greathouse & Son, Inc.*, 1986 WL 7391, at *5.

To whatever extent the Plaintiff suffered harm from signing the Lease Agreement with a fictitious entity in reliance on the existence of that entity, that harm was complete no later than May 14, 2006, when the Lease had a validly incorporated entity as a tenant. Any cause of action accrued at that time, at the latest, and expired no later than May 14, 2010.

### B.      Proximate Cause.

Separately, the Court concludes that there is no set of facts upon which a reasonable factfinder could find that the Plaintiff's damages were proximately caused by the Plaintiff's justifiable reliance on Francus' misrepresentation that Geneva Village DE, LTD was incorporated or registered as of March 11, 2004. The elements of a fraudulent inducement claim are "(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (3) intent to induce reliance on the representation; (4) justifiable reliance; and (5) injury proximately caused by the reliance." *Cintrifuse Landlord, LLC v. Panino, LLC*, 2022-Ohio-4104, ¶ 64, 201 N.E.3d 488, 501 (Ohio Ct. App. 2022).

Geneva Tenant was incorporated on November 8, 2005, before the Initial Term even began, and performed under the Lease from the start of the Initial Term in 2006 to 2020. Ohio courts have defined proximate cause as "an act or failure to act which in the natural and continuous sequence directly produces the [injury] claimed, and without which it would not have occurred. Cause occurs when the [injury] is the natural and foreseeable result of the act or failure

to act." *Doyle v. Fairfield Machine Co., Inc.*, 120 Ohio App. 3d 192, 210, 697 N.E.2d 667, 679 (1997) (*quoting* 11 Ohio Jury Instructions (1995) 171, Section 11.10(2)).

The fraud asserted by the Plaintiff relies on Francus's alleged misrepresentation, made by implication if not expressly, that the putative Tenant, Geneva Village DE, LTD., was an incorporated and/or registered legal entity. However, the Tenant's lack of incorporation was cured no later than May 14, 2006, when the Lease Amendment specified by agreement of all relevant parties that validly organized Geneva Tenant was the Tenant under the Lease. The Plaintiff has not alleged any causal connection, let alone a proximate one, between the damages it suffered in or after 2020 and the circumstances prior to May 14, 2006, during which no incorporated entity was recognized by both parties as the tenant under the Lease. This is not analogous to other cases in which events were set in motion by earlier bad acts that took years to manifest injury, but that injury still plausibly resulted from the earlier conduct. *See, e.g., Velotta v. Leo Petronzio Landscaping, Inc.*, 69 Ohio St. 2d 376, 433 N.E.2d 147 (1982) (negligently installed drainage tile allegedly began causing extensive water damage years after installation). Francus did not set anything in motion by misrepresenting the corporate existence of Geneva Village DE, LTD in 2004 that proximately caused the Debtors to stop paying rent in 2020.

The Court therefore concludes that summary judgment should be granted to the Defendants on Count VI of the Complaint, and its recommendation to the district court will so reflect.

## V. Regarding the Plaintiff's Two Tortious Interference Claims, Count VII Cannot Survive Summary Judgment, but the Plaintiff Has Brought Forward Sufficient Evidence in Support of Count VIII to Create a Triable Issue of Fact.

Count VII is entitled "Tortious Interference with Lender," which in substance is a claim for tortious interference with the Plaintiff's contract with its lender. Count VIII is also a cause of action for tortious interference with a contract, in this case the prospective or then-forming

34

relationship with the new operator. Tortious interference claims can be fact-intensive and can thus be difficult to determine on summary judgment. The Court concludes that Count VIII is just such a claim and survives summary judgment. However, Count VII, in which the Plaintiff alleges that the Defendants interfered with the relationship between Plaintiff and Fifth Third Bank, is not supported by sufficient evidence to survive summary judgment; no reasonable factfinder could find in favor of the Plaintiff on this claim.

The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another. *A & B-Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14, 1995-Ohio-66, 651 N.E.2d 1283, 1294 (1995). Ohio appellate courts have noted that the two forms of tortious interference are similar. *See, e.g., Inwood Village, Ltd. v. The Christ Hospital*, 2012 WL 3104407, at *3, 2012-Ohio-3434, ¶ 17 (Ohio Ct. App. Aug. 1, 2012). The primary difference between the two is the form of the damage the tortfeasor is alleged to have caused: Tortious interference with a business relationship occurs when the result of the improper interference is not a breach of contract, but the refusal of a third party to enter into or continue a business relationship with the plaintiff. *Id.* (quotation omitted).

A.   **Count VII - Tortious Interference with Lender.**

The Defendants assert that the Plaintiff must prove that the Plaintiff's lender either refused to do business with the Plaintiff or that the lender terminated an existing relationship with the Plaintiff as a result of the Defendants' actions. (Defendants' Motion at 34, Docket No. 182.) The Defendants then contend that the Plaintiff has not even alleged any such facts in its Complaint. It is true that the Plaintiff has not alleged that the Plaintiff's lender terminated the

relationship or refused to do further business with the Plaintiff. The fact that the Plaintiff designated its cause of action as "Tortious Interference with Lender" is inartful and unhelpful, since it does not specify whether the tort alleged is one of interference with contract or interference with a business relationship. However, the substance of the claim is one for tortious interference with contract: The final paragraph of this count of the Complaint states, "Francus's and VRC's actions have caused a breach in Plaintiff's contract with its lender and resulted in Plaintiff incurring additional damages." (Complaint ¶ 100, Docket No. 70.) "The elements of a claim for tortious interference with a business relationship or contract are: (1) a business relationship or contract; (2) the defendant's knowledge of the relationship or contract; (3) the defendant's intentional or improper action taken to prevent a contract formation, procure a contractual breach, *or* terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." *Smith v. National Western Life*, 2017-Ohio-4184, ¶ 20, 92 N.E.3d 169, 175 (Ohio Ct. App. 2017) (emphasis added); *see also Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 1999-Ohio-260, 707 N.E.2d 853 (1999), paragraph one of the syllabus.

Count VII of the Complaint alleges that "Francus and VRC have presented false financial statements to Plaintiff and its lender" (Complaint ¶ 98, Docket No. 70); that they "made these false statements and have refused to pay rent with the intent to harm Plaintiff and Plaintiff's relationship with its lender" (*id.* ¶ 99); and that their "actions have caused a breach in Plaintiff's contract with its lender and resulted in Plaintiff incurring additional charges" (*id.* ¶ 100). This raises the obvious question of: *What* false statements have the Defendants been alleged to have made to Fifth Third Bank? The Defendants conducted discovery on that issue and attached the Plaintiff's responses to certain written discovery to the Defendants' Motion. (Defendants' Motion, Ex. 1-1, Docket No. 182-1.) In response to the Defendants' Interrogatories Nos. 10 and

36

11, requesting that the Plaintiff identify the dates that they allege that Francus provided false financial statements to the Plaintiff and Plaintiff's lender, respectively, the Plaintiff answered in each case, in full, "every financial statement since March 2020 that falsely indicated that the rent had been paid." (Defendants' Motion, Ex. 1-1 at 15, Docket No. 182-1.) In response to requests for admission that were part of the same set of written discovery, the Plaintiff denied that the false indication that rent had been paid was the sole basis for the allegation of false statements. However, in response to the Defendants' discovery, as presented to the Court on summary judgment, the Plaintiff fails to provide any other alleged basis for this central allegation of Count VII.

In addition, and more important, the Plaintiff does not provide any evidence supporting its claim in response to the Defendants' Motion, whereas the Defendants' Motion properly supports its factual positions "citing to particular parts of materials in the record, including … admissions [and] interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Bankr. P. 7056. After such a showing, pursuant to *Celotex* and *Babcock & Wilcox*, the Plaintiff was required to cite to other parts of the record to demonstrate the existence of a genuine issue of material fact for trial. The Plaintiff did not do so, and in fact, the only mention of the lender in the Plaintiff's Response was a refutation of a tertiary factual contention by the Defendants—that the Defendants never supplied financial statements directly to Fifth Third. The Plaintiff cites to a deposition transcript of the Plaintiff's bookkeeper, stating that the Defendants would occasionally furnish such statements directly. (Plaintiff's Response at 6 and Ex. E thereto, Docket Nos. 191 and 191-5.) This is therefore a disputed issue of fact, but not of material fact, because ultimately, it does not matter. Even supposing the Defendants did furnish financial statements directly to Fifth Third, the Plaintiff fails to offer even a "scintilla of evidence"

37

suggesting that the statements were in fact false. Among other things, the statements themselves are not provided, and the only statement in the Plaintiff's Response on the subject was that the "rent was reported as a loss on the balance sheet, even though rent was not actually paid." Such a report would not obviously be improper given that the rent was still due and therefore the Debtors' liabilities would have increased to the extent the rent expense remains unpaid. The Plaintiff does not specify how they claim this should have been reported. In addition, the Plaintiff fails to show that Fifth Third took actions with respect to its existing or prospective contractual relationships with the Plaintiff that it would not have otherwise. Finally, the Plaintiff fails to show how it was damaged by those alleged third party actions instigated by allegedly false statements contained in the Debtors' financial statements.

Because the Plaintiff fails to articulate any reasonable theory for recovery on account of the Defendants' tortious interference with its lender relationship and also fails to support its claim with evidence sufficient to show the existence of any disputed material facts, the Defendants' Motion for summary judgment will be granted as to Count VII and its report and recommendation to the District Court will so reflect.

### B. Count VIII - Tortious Interference with Contract.

Count VIII of the Complaint asserts a cause of action for tortious interference with the Plaintiff's ability to find a new tenant for the nursing home property. As alleged by the Complaint, the Defendants interfered with prospective replacement tenants and/or operators for the nursing home both directly, "by demanding money to which they were not entitled and/or threatening to destroy the business" (Complaint ¶ 103, Docket No. 70), and indirectly, in that they "actively encouraged resident [sic] of the [nursing home] to transfer to another location during the final months of [the] Lease" (Complaint ¶ 104, Docket No. 70). In the Declaration of

Stephen Krutowsky, principal of the Plaintiff, submitted with the Plaintiff's Response, the Plaintiff further asserts that twenty out of thirty-five residents transferred or discharged from the nursing home between March 15 and April 16, 2021, and two more transferred between then and when the new operator took over operations. (Decl. of Stephen Krutowsky ¶ 14, Docket No. 191-1.) Mr. Krutowsky further asserts damages in the form of more than $100,000 in concessions his company, the Plaintiff, was required to make to the new tenant because of the drop in the census of residents, and submitted a "census concession agreement" as evidence thereof. (*Id.* ¶ 16.) The Plaintiff's Response further alleges that five of the twenty-plus transferring residents transferred to other nursing homes managed by Defendant VRC— presumably still to be managed by VRC even after VRC lost the contract to manage the Geneva nursing home. It may be that, under the circumstances of this case, the Defendants had the justification or privilege to do so, and lack of privilege is an element of tortious interference that the Plaintiff must prove, but the Defendants have not established on summary judgment that the Plaintiff cannot carry its burden on that element of the cause of action.

Instead, the Defendants' Motion focuses on the assertion that "the Defendants are entitled to judgment because the Landlord's claim is based entirely upon alleged actions which took place before the Landlord and the potential new operator had entered into a lease and, even more important, before Geneva Operator and the potential new operator had entered into the operations transfer agreement … [so] there was no contract with which the Defendants could interfere." (Defendants' Motion at 37-38, Docket No. 182.) However, there is contrary authority in Ohio law that the Defendants do not address in their Motion, and the Plaintiff properly cites in the Plaintiff's Response. Ohio law recognizes the tort of intentional interference with a prospective contractual relationship. *Gray-Jones v. Jones*, 137 Ohio App. 3d

93, 100, 738 N.E.2d 64, 69 (Ohio Ct. App. 2000) (citing *A & B Abell Elevator Co.*, 73 Ohio St. 3d at 14). The type of relations protected from interference under this theory includes "any prospective contractual relations … if the potential contract would be of pecuniary value to the plaintiff." *Gray-Jones*, 137 Ohio App. 3d at 101, citing comment *c* to the Restatement of the Law 2d, Torts (1979) 20, § 766B.

In *Fred Siegel Co.*, the Ohio Supreme Court also adopted section 767 of 4 Restatement of the Law 2d, Torts (1979), holding that

> in determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel Co.*, 85 Ohio St. 3d at 178–79. This is a fact-intensive standard, and the Plaintiff has produced enough evidence touching on enough of the elements of the Restatement adopted by the Ohio Supreme Court to survive summary judgment on Count VIII.

Therefore, the Court will deny the Defendants' Motion for summary judgment on Count VIII.

**VI.    Despite Being Captioned "Piercing the Corporate Veil," the Plaintiff Concedes That Count IX of the Complaint Is Exclusively an Action To Recover Fraudulent Transfers Allegedly Made By the Debtors, and Those Actions Became Property of the Debtors' Bankruptcy Estate and Were Settled by the Trustee.**

The allegations in Count IX of the Complaint do not expressly mention fraudulent transfers. The Complaint alleges only that Francus' control over the Debtors and VRC was so complete that they "have no separate mind, will, or existence of their own" (Complaint ¶ 113, Docket No. 70), and that he used that control of the entities "in such a manner as to commit a fraud or illegal act against Plaintiff" (Complaint ¶ 114, Docket No. 70), by which the Plaintiff

40

was harmed. In addition, regarding damages, that count alleges that "the Court should disregard the corporate entities" of the Debtors and VRC "and hold … Francus liable jointly and severally for the debts owed by [the Debtors and VRC] to Plaintiff."

The argument that Plaintiff advances in its Motion, however, is both different and more specific. The partial summary judgment sought in the Plaintiff's Motion seeks "to pierce the corporate veils of Debtors … to hold Francus and [VRC] liable for fraudulent transfers that have particularly harmed Plaintiff and that Plaintiff has particular standing to pursue under Ohio law." (Plaintiff's Motion at ii, Docket No. 183.) The Plaintiff's Motion identifies a series of monthly transfers, one per month from March 31, 2020 to March 31, 2021, from Geneva Operator to VRC, totaling $1,119,177 (the "Insider Transfers") and reflected a reduction of a note payable balance owed by Geneva Operator to VRC, though no such note appears in the record.

The Plaintiff argues that "Plaintiff—rather than the Trustee—has standing to assert this request … because the because the subject fraudulent transfer claims are not 'general claims that could be brought by any creditor of the estate, but rather can only be brought by particular creditors, such as Plaintiff, whose claims for rent arose before the various transfers were made." (Plaintiff's Motion at 17, Docket No. 183.) This is an inaccurate statement of the law. Pursuant to 11 U.S.C. § 544(b), the Trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of [the Bankruptcy Code] or that is not allowable only under section 502(e) of [the Bankruptcy Code]."

The Uniform Fraudulent Transfer Act ("UFTA") claims against VRC pursuant to O.R.C. § 1336.01 *et seq.* based on the Insider Transfers became property of the estate administered by the Trustee, and were settled and released as part of the global settlement

41

approved by this Court embodied in the Related Party Settlement Agreement.  *See, e.g., The Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253 (5th Cir. 2010) (although UFTA claims under state law "could not be brought by the debtor … such claims become estate property once the bankruptcy is under way by virtue of the trustee's successor rights under § 544(b)" (quotation and citation omitted));  *In re C.D. Jones & Co., Inc.*, 482 B.R. 449, 455–56 (Bankr. N.D. Fla. 2012) ("If the claims and causes of action in the [non-trustee's] suit are, in reality, fraudulent transfer claims that would have been available to creditors pre-petition, this Court finds that the right to recover any such fraudulent transfers is property of the bankruptcy estate."); *In re Berg*, 376 B.R. 303, 311 (Bankr. D. Kan. 2007) (right to recover UFTA claims "was exclusively vested in the Trustee. The commencement of bankruptcy gives the trustee the right to pursue recovery of fraudulently conveyed assets to the exclusion of all creditors.  Therefore, … an unsecured creditor of the Debtor who had an UFTA claim pending on the date of filing the bankruptcy, had no standing to continue the litigation during the pendency of the case." (quotation omitted)).

The Defendants' Motion, filed simultaneously with the Plaintiff's Motion and without the benefit of its narrow focus of Plaintiff's Count IX claims, assumes a broader view of Count IX and argues for summary judgment comprehensively, not merely on the more limited theory advanced in the Plaintiff's Motion.  The Defendants cite both Delaware and Ohio corporate law, arguing that Delaware law should apply to the Delaware entities (Geneva Tenant and VRC) and Ohio law to the Ohio entity (Geneva Operator), though the rules appear generally similar.  In Ohio, the leading case is *Belvedere Condominium Unit Owners Ass'n v. R.E. Roark Cos, Inc.*, 67 Ohio St. 3d 274, 617 N.E.2d 1075, 1993-Ohio-119 (1993), which establishes a three-part test for piercing the corporate veil under Ohio law as follows:

> [T]he corporate form may be disregarded and individual shareholders held liable
> for corporate misdeeds when (1) control over the corporation by those to be held

liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 289 (adopting the approach of *Bucyrus-Erie Co. v. General Products Corp.*, 643 F.2d 413 (6th Cir. 1981)).  The Ohio Supreme Court later expanded the second prong of this test slightly to include "fraud, an illegal act, or a similarly unlawful act," but cautioned that "[c]ourts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct."  *Dombroski v. WellPoint, Inc.*, 119 Ohio St. 3d 506, 513, 895 N.E.2d 538, 2008-Ohio-4827 (2008).  Delaware law similarly requires "fraud or something like it" to pierce the corporate veil and hold a corporate shareholder liable for the obligation of the corporation.  *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 268 (D. Del. 1989).  The *Mobil Oil* court similarly cautioned against excessively expanding the principle:

> Any breach of contract and any tort … is, in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.

*Id.* at 268.

The Defendants argue that Francus should be granted summary judgment on this point because, they argue, the only damages asserted is the unpaid rent due from the Debtors and that such an ordinary breach of contract is not "the type of exceptional wrong that piercing is designed to remedy," *Dombrowski*, 119 Ohio St. 3d at 513-14.  However, on the face of the Complaint, unpaid rent may not be the *only* damage theory alleged.  Count IX could be plausibly read as a claim for relief or recovery against Francus for all claims asserted by Plaintiff against

43

the corporate defendants for which they may be held liable, including the tort claims as well as the contractual claims for unpaid rent.

Nevertheless, although invited to assert a more expansive array of claims in Count IX by the Defendants' Motion, in its Response the Plaintiff reiterates that Count IX is limited to its fraudulent transfer claims. The Plaintiff argues that it satisfies the second element of the *Belvedere* test for piercing the corporate veil because a fraudulent transfer claim qualifies as committing "fraud or an illegal act" pursuant to Ohio law, citing to *Hitachi Medical Systems America, Inc. v. Branch*, 2011 WL 3921718, at *2 (N.D. Ohio Sept. 7, 2011). Plaintiff further makes the point that while a fraudulent transfer qualifies as fraud sufficient for purposes of the particular element of the *Belvedere* test, such allegations do not require pleading with particularity pursuant to Rule 9 of the Federal Rules of Civil Procedure and Rule 7009 of the Federal Rules of Bankruptcy Procedure. *Flagstar Bank, FSB v. Sellers*, 2010 WL 3294683, at *3 (Ohio Ct. App. Aug. 23, 2010). Plaintiff concludes its defense of the Defendants' Count IX summary judgment argument by incorporating its own argument in favor of summary judgment on that same count, which, as previously noted, was limited to a fraudulent transfer theory against Francus and/or VRC.

Unfortunately for the Plaintiff, these fraudulent transfer claims became the exclusive province of the Debtors' bankruptcy estates when the Debtors filed their bankruptcy petition, and of the Trustee when the chapter 11 cases were converted to chapter 7 and the Trustee was appointed. The Trustee has settled those claims conclusively, foreclosing any attempt by the Plaintiff -- a creditor of the Debtors' estates -- to recharacterize them as its personal claims.

The Court will therefore grant the Defendants' Motion with respect to Count IX of the Complaint. The Court concludes that (i) piercing the corporate veil is not available as a remedy

44

to recover either the ordinary contractual rent and related expenses alleged to be due pursuant to Counts I-IV of the Complaint, and (ii) piercing the corporate veil is no longer available to avoid any fraudulent or preferential transfers that the Plaintiff sought to recover in Count IX because those claims became property of the Debtors' bankruptcy estates and were settled by the Trustee.

## **CONCLUSION**

The Court will enter an order consistent with this Memorandum Decision:

A.      Denying summary judgment to both Plaintiff and Francus on Count I of the Complaint;

B.      Recommending that summary judgment be granted in Defendants' favor on Counts II, III, VI, and VII of the Complaint;

C.      Denying Summary Judgment to the Defendants on Counts V and VIII of the Complaint; and

D.      Granting summary judgment in the Defendants' favor on Count IX of the Complaint.

###

21-05016-amk    Doc 200    FILED 10/16/24    ENTERED 10/16/24 16:57:25    Page 45 of 45